IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DANIELLE DUCKETT | : | CIVIL ACTION |
| --- | --- | --- |
| | : | |
| v. | : | No. 18-4017 |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| HEALTH AND HUMAN SERVICES | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                                       **July 16, 2019**

Plaintiff Danielle Duckett alleges that Defendant Pennsylvania Department of Human Services (DHS),[1] her former employer, discriminated against her based on her sex by permitting a hostile work environment to exist during her employment. She brings this action under Title VII of the Civil Rights Act of 1964 (Title VII) and the Pennsylvania Human Relations Act (PHRA). The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court will grant DHS's motion for summary judgment and deny Duckett's motion for summary judgment.

**FACTS[2]**

Duckett, a female, was employed by DHS in a supervisory role from March 31, 2014 until her January 3, 2017, resignation. Duckett Aff. ¶ 4(a), (d), (s). One of the employees Duckett supervised was Lee Franczyk. *Id.* at ¶ 4(e). Duckett alleges Franczyk's conduct created a hostile work environment.

---

[1] Duckett's Complaint misidentified Defendant as "Commonwealth of Pennsylvania Department of Health and Human Services."

[2] The following facts are drawn from the summary judgment record, which consists of documents—primarily emails—attached to the parties' motions, and affidavits or declarations by Plaintiff and various DHS personnel. The facts are undisputed, except where specifically noted to the contrary. At the summary judgment stage, the Court views the facts in the light most favorable to the non-movant.

One of Franczyk's duties involved conducting regulatory field inspections of treatment providers for DHS licensing purposes. *See* Pl.'s Mot. Ex. C. These providers complained to Duckett that, between May and June of 2016, Franczyk engaged in sexual harassment and inappropriate behavior during field inspections. *See id*. Franczyk's behavior included inappropriate comments to provider staff, touching a patient's back and shoulders, and viewing pornographic material on his phone in a provider's office. *See id*. Duckett and her supervisor, Sandra Wooters, investigated the complaints. Duckett Aff. ¶ 4(i), (j). Individuals from relevant DHS bureaus were consulted and concluded the complaints "appeared" credible and Franczyk's behavior could "be considered a violation of" DHS's policy prohibiting sexual harassment. Pl.'s Mot. Ex. E. On September 6, 2016, Duckett communicated the nature of the investigation to Franczyk and informed him she would conduct a hearing concerning the allegations. Def.'s Mot., Ex. 4. On September 23, 2016, following the hearing, Duckett and Wooters informed Franczyk he was suspended five days for violating DHS policy prohibiting sexual harassment and for tardiness. Def.'s Mot., Ex. 5; *see* Pl.'s Mot. Ex. G.

In September 2016, while the investigation was ongoing, Franczyk began monitoring the habits, and particularly the arrival times, of his coworkers. *See* Pl.'s Mot. Ex. F. Franczyk reported the perceived tardiness of a male coworker directly to Wooters. *See id.* On October 11, 2016, Duckett, by email, brought this behavior to the attention of George Moore at DHS. *Id.* Duckett's email described another incident in which a female coworker observed a note Franczyk had created documenting her tardiness. *Id.*

Franczyk's behavior toward Duckett, specifically, became hostile during and following the investigation. *See* Duckett Aff. ¶ 4(l), Pl.'s Mot., Ex. A ("It was after this investigation, that Franczyk targeted me heavily and repeatedly."). Franczyk informed Duckett and Wooters he

2

would "get rid of" them both for suspending him. *Id.* at ¶ 4(k). In a statement Duckett later provided to DHS personnel, she described Franczyk's behavior during this period:

> During the investigation of the Sexual Harassment allegation against him . . . he stated he didn't want to talk to me face to face . . . , when I would ask him to process work he would throw things on the floor and get upset. One encounter he stopped me mid-sentence and said I was mean, and cold hearted for what I was doing to him – he further stated it was upsetting to him as a husband and a father. Once . . . after telling him what I needed him to process he threw something at the wall. After he received his discipline regarding the Sexual Harassment allegations- he got up and stormed out of my supervisor[']s office saying "I don't know how to talk to anyone" and then while I followed him down the hall . . . I heard him state[] "A fuckin bitch" while throwing his empty water bottle. . . .

Pl.'s Mot. Ex. G.

Duckett also contends Franczyk began "stalking" her. Duckett Aff. ¶¶ 4(m), (n), Pl.'s Mot., Ex. A. Duckett observed Franczyk's car driving down her street on one occasion. Pl.'s Mot. Ex. G; *see also* Duckett Aff. ¶ 4(m), Pl.'s Mot. Ex. A (stating Franczyk was "casing" Duckett's house). Franczyk allegedly "stalked" Duckett on the internet as well. Duckett Aff ¶ 4(m), Pl.'s Mot. Ex. A. Duckett learned through a friend that Franczyk's wife had used Facebook to ask another individual about Duckett and had told that individual that Duckett "hadn't been nice to" Franczyk. Pl.'s Mot. Ex. G. Duckett suspected Franczyk had caused her to receive multiple messages notifying her of attempts to change her Facebook password. *Id.*

On October 19, 2016, Duckett had to pull her car over due to mechanical problems and get roadside assistance. *See* Pl.'s Mot. Ex. G. Lug nuts to her tires were missing and her emergency brake line was cut. *Id.* The tow driver and dealership staff indicated to Duckett someone had done this to her car, and Duckett suspected Franczyk. *See id*. On October 20, 2016, Duckett emailed Wooters and George Moore at DHS, describing what had happened to the car, Franczyk's outbursts in the office, the allegation that Franczyk was driving on Duckett's block, the Facebook message by Franczyk's wife, and Duckett's suspicions about her Facebook password. *See* Pl.'s

3

Mot. Ex. G. Additionally, Duckett informed Wooters and Moore that Franczyk had "been confrontational" with other staff and tracked their arrival times. *Id.*

DHS contends it took several steps in response to Duckett's email. Based on police instruction, Moore determined DHS should not independently investigate the incident with Duckett's car while police were investigating. Moore Decl. ¶ 9, Def.'s Mot. Ex. 6. Moore and Wooters discussed the possibility of transferring Franczyk to either a different office or a different supervisor. *Id.* at ¶ 10. However, they determined transfer was not possible at the time because Duckett was the only supervisor for Franczyk's licensing section in his current office and because transfer to another office would require a substantiated allegation against Franczyk under the union agreement. *Id.*; Wooters Decl. ¶ 11, Def.'s Mot. Ex. 1. Moore and Wooters also "discussed" arranging Duckett and Franczyk's work schedules to minimize the times they were in the office together. Moore Decl. ¶ 11, Def.'s Mot. Ex. 6. Wooters increased her presence in the office and arranged for increased monitoring by security officers and increased lighting in the parking lot. Wooters Decl. ¶ 13, Def.'s Mot. Ex. 1. Wooters also "held several formal counseling sessions and informal discussions" with Franczyk "to address the various concerns about his behavior towards his co-workers." *Id.* at ¶ 14. Duckett, for her part, contends she was informed only that Franczyk's union status prevented DHS from moving him from her supervision or office. Duckett Aff. ¶ 4(p), Pl.'s Mot. Ex. 1.

On December 8, 2016, Duckett reported to Diane Murray at DHS that Franczyk had texted her and another female DHS employee a link to download a potentially malicious application on their phone. *See* Pl.'s Mot. Ex. K. On December 15, 2017, Duckett communicated her resignation, effective January 3, 2017, to DHS, informing DHS she was "forced to leave due to ongoing threats to [her] safety and the intolerable hostile work environment that has been created based on the

employee" she supervised. Pl.'s Mot. Ex. L. Duckett had previously conveyed to Wooters her interest in the new job she took working for a state legislator. *See* Wooters Aff. ¶ 30, Def.'s Mot. Ex. 1.

On January 4, 2017, another one of Duckett's subordinates, Dina Scarci, learned Franczyk had told a coworker that Duckett and Scarci were in a relationship. Pl.'s Mot. Ex. H. Scarci reported this to Wooters by email, *id.*, and later made a formal Equal Employment Opportunity complaint to DHS, Pl.'s Mot. Ex. I. In her complaint, Scarci described at least two earlier, 2016 incidents in which a coworker reported to Scarci that Franczyk was looking at pictures of Scarci and Duckett together on Facebook. *See* Pl.'s Mot. Ex. I. On one of these occasions, the coworker said "Franczyk was 'stalking' [Scarci] on Facebook." *Id.*; *see* Scarci Aff. ¶ 3(j), Pl.'s Mot. Ex. B. Scarci also resigned in August 2017. Pl.'s Mot. Ex. N.

On September 18, 2018, Duckett brought this action. Following the close of discovery,[3] the parties filed the instant cross-motions for summary judgment.

**DISCUSSION**

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absences of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

---

[3] The parties did not take any depositions during the discovery period and rely on affidavits and documents DHS produced with its initial disclosures.

5

477 U.S. 317, 323 (1986) (citation and internal quotation marks omitted). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material facts." *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000) (citations omitted). "Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009).

Where, as here, cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (alteration omitted) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998)).

Duckett brings a claim for sexual harassment in violation of Title VII,[4] which makes it unlawful for an employer "to discriminate against any individual with respect to his compensation,

---

[4] Duckett also brought a claim against DHS for violation of the PHRA, 43 Pa. Stat. § 951 *et seq.*, which, among other things, makes it unlawful for an employer to discriminate against an individual with respect to certain employment terms or conditions because of their sex. *See* § 955(a). Pennsylvania has retained Eleventh Amendment immunity against PHRA claims brought in federal courts. *Dieffenbach v. Dep't of Revenue*, 490 F. App'x 433, 435 (3d Cir. 2012) (citing 42 Pa. Cons. Stat. Ann. § 8521(b)). Accordingly, and as Duckett concedes, DHS is immune from Duckett's PHRA claim and thus judgment will be entered in DHS's favor on this claim.

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1). "Title VII prohibits sexual harassment that is 'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (alteration in original). To establish a hostile work environment claim alleging discrimination based on sex, a plaintiff must establish that (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability. *Id.* DHS is entitled to summary judgment because Duckett has failed to establish the first element of her claim—intentional discrimination motivated by her gender. Title VII is not a general civility code. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988). A plaintiff must show gender is a substantial factor in the discrimination and that, if not her for gender, she would not have been treated in the same manner. *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998)) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."). Nevertheless, impermissible discrimination need not include sexual overtones in *every* instance. *Andrews*, 895 F.2d at 1485. "[T]he pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." *Id.*

In *Brown*, the Second Circuit affirmed summary judgment for a hostile work environment defendant where the plaintiff failed to produce evidence that her mistreatment was motivated by

7

her gender. 257 F.3d at 255–56. The plaintiff and the harasser were adversaries in a union election. *Id.* at 249. During and after the election, the harasser mocked the female plaintiff, lied about her, and alleged publicly that the plaintiff and a male coworker were in a relationship. *Id.* The harasser was also responsible for placing two obscene pictures near the male coworker's mail route that included references to the plaintiff and the male coworker. *Id.* at 250. The Second Circuit held that the fact that a male coworker was treated similarly did not, per se, foreclose that the harassment was based on sex. *Id.* at 254. However, the Court determined the plaintiff's evidence insufficient to survive summary judgment, particularly because the plaintiff had never suggested the harassment was related to her sex and repeatedly linked the conduct to the union election. *Id.* at 255–56; *see also Pugliese v. Cnty. of Lancaster*, No. 12-7073, 2016 WL 354882, at *18 n.5 (E.D. Pa. Jan. 27, 2016) ("The fact that [the harasser] may have had a conflict with plaintiff and did not like plaintiff hardly constitutes intentional discrimination based on sex. Such incidents occur in every workplace in America. Nor does yelling at plaintiff or being rude to her constitute sexual harassment.").

Here, as in *Brown*, the evidence presented by Duckett could not lead a reasonable jury to conclude any harassment she was subject to was based on sex. And as the harassment in *Brown* began with a union election, Franczyk's behavior toward Duckett began with a gender-neutral workplace dispute: Duckett's involvement in investigating and disciplining Franczyk for his behavior during field inspections. Duckett concedes Franczyk's behavior toward her began after this investigation. *See*, *e.g.*, Duckett Aff. ¶ 4(l), Pl.'s Mot. Ex. A ("It was after this investigation, that Franczyk targeted me heavily and repeatedly."). Franczyk's comment to Duckett and Wooters that he would "get rid of" them also followed his discipline. Franczyk's conduct toward Duckett in the office and during her tenure appears to be limited to yelling and throwing things when

8

confronted about the investigation or assigned work. Despite describing Franczyk's misconduct in great detail, Duckett's October 20, 2016, email to Wooters and Moore omits any reference to gender-based or sexual conduct directed to Duckett. *See* Pl.'s Mot. Ex. G. Instead, Duckett communicated to Wooters and Moore the temporal connection between the investigation of Franczyk and his behavior. Similarly, when Duckett discussed Franczyk's treatment of other staff, she did so in a gender-neutral manner. When Duckett related Franczyk tracking the arrival time of his coworkers, Duckett noted Franczyk "expressed that . . . he is being held to a standard that other employees are not." *Id.* While the allegations that Franczyk tampered with Duckett's car and stalked her outside of the office are more serious than Franczyk's in-office demeanor toward Duckett, they add no indicia of sexual discrimination. There simply is no indication in this comprehensive summary by Duckett that Franczyk's behavior was sexually discriminating.[5]

The investigation and discipline of Franczyk, was, of course, based on allegations of sexual harassment by Franczyk during field inspections. But there is no evidence that Duckett was present for this behavior. Franczyk's behavior directed toward others, outside of Duckett's presence, is not evidence of her hostile work environment claim. *See Woodard v. PHB Die Casting*, 255 F. App'x 608, 609 n.1 (3d Cir. 2007); *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005). While such evidence could be relevant to show otherwise ambiguous comments toward Duckett were motivated by sex, *see Woodard*, 255 F. App'x at 609 n.1, there are no ambiguously sexual comments directed to Duckett here, nor is there a close relation between the apparently overt sexual nature of Franczyk's behavior toward provider staff and the nonsexual hostility directed toward Duckett, *see Mandel*, 706 F.3d at 167 ("The question of whether evidence of discrimination against

---

[5] Similarly, Scarci contended she believed "Franczyk targeted [her] because [she] had a good rapport and friendship with Ms. Duckett." Scarci Aff. ¶ 3(m), Pl.'s Mot. Ex. B.

9

other employees by other supervisors is relevant is fact based and depends on several factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.").

Nor is Franczyk's treatment of two female coworkers indicative of sexual harassment of those coworkers or of Duckett. In one instance, Duckett reported in a March 30, 2016, email that a female coworker was fearful of Franczyk and did not want to work with him, "with him making allegations about her." Pl.'s Mot. Ex. D. But there is no evidence identifying the nature of Franczyk's conduct or statements toward this coworker. Duckett's characterization of this treatment as sexual harassment is speculative. Similarly, evidence that Franczyk noted another female coworker's tardiness does not demonstrate harassment based on sex where the same evidence shows he reported the tardiness of a male coworker around the same time. *See* Pl.'s Mot. Ex. F. The email evidence of this specific behavior also overwhelmingly suggests it was motivated by the investigation of Franczyk, not gender discrimination. For example, Franczyk emailed Duckett, "I have been held to the standard of being on time. I feel that I have been singled out for this issue as I have observed many staff being late . . . ." *Id.*

Duckett does, however, rely on alleged comments Franczyk made concerning a relationship between Duckett and a third female coworker, Dina Scarci. Duckett attested that Franczyk "repeatedly accused [Duckett], in person and to my co-workers for [sic] having a lesbian affair with one of [Duckett's] subordinates; repeatedly questioned [Duckett's] sexual orientation, and accus[ed] [Duckett] of giving female employees preferential treatment." Duckett Aff. ¶ 4(f), Pl.'s Mot. Ex. A. However, a self-serving and conclusory affidavit is insufficient to withstand summary judgment. *Kirleis*, 560 F.3d at 161 (determining whether genuine issue of material fact existed to dispose of motion to compel arbitration, and recognizing the standard was identical to

the summary judgment standard). In *Kirleis*, the Third Circuit rejected the defendant's contention that the plaintiff's affidavit was insufficiently conclusory, because the affidavit "detail[ed] the specific circumstances that rendered the formation of [the relevant contract] impossible." *Id.* By contrast, in *Larochelle v. Wilmac Corporation*, a case where the plaintiff claimed she was forced to resign as retaliation for reporting sexual harassment, the Third Circuit found the evidence "undercut[] the conclusory affidavit" that the plaintiff was told she had to resign. 769 F. App'x 57, 61 (3d Cir. 2019). Here, Duckett's affidavit is analogous to *Larochelle* and distinct from *Kirleis*. Unlike the *Kirleis* plaintiff, Duckett does not detail "specific circumstances." She fails to describe a single instance of Franczyk making accusations to her personally. And, as in *Larochelle*, other evidence undercuts her affidavit. The allegations of Franczyk making these comments are absent from Duckett's multiple emails to Wooters and Moore and from Duckett's resignation letter. The evidence shows Scarci learned on January 4, 2017—after Duckett's resignation—that Franczyk stated to a coworker Duckett and Scarci were in a relationship. There is no evidence this statement was made "repeatedly" as Duckett claims, that it was made before Duckett resigned, or that Duckett was ever aware of it before she resigned. In light of the self-serving and unsupported nature of this aspect of Duckett's affidavit, it is insufficient to defeat summary judgment. As for the isolated comment Scarci later heard, even if Duckett had learned about it while she was employed, it was nonetheless one-off "idle gossip" insufficient to support a hostile work environment claim. *Spain v. Gallegos*, 26 F.3d 439, 448–49 (3d Cir. 1994).

The evidence overwhelmingly indicates Franczyk's treatment of Duckett was "grounded in workplace dynamics" and Duckett cannot now "rescue her claim with a last-minute conversion to the position that, instead of what she had consistently said before, she faced adverse conditions because she is a woman." *Brown*, 257 F.3d at 256. Accordingly, the Court finds a reasonable jury

could not find the first element of a hostile work environment claim has been established, and DHS is entitled to summary judgment on this claim. The Court therefore does not address DHS's argument that Duckett cannot, as a matter of law, establish the fifth element of a hostile work environment claim, *respondeat superior* liability.[6]

Although not clearly defined in her Complaint, Duckett also claims DHS is liable under a constructive discharge theory. "To establish a constructive discharge, [the plaintiff] must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Mandel*, 706 F.3d at 169. "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004). Because Duckett did not produce evidence to support her hostile work environment claim, she cannot, as a matter of law, proceed on her constructive discharge theory.[7]

---

[6] An employer is liable for "non-supervisory co-worker sexual harassment only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). In other words, the employer is liable if it was negligent in failing to discover or in responding to harassment. *Id.* at 104–05. The Court does not reach the issue of DHS's negligence. However, this should not be interpreted as approval of either DHS's response or Franczyk's alleged misconduct. Even without a discriminatory motive, Franczyk's alleged behavior was insubordinate, disrespectful, and, with respect to Duckett's car, if proven, possibly criminal. The gravity of Franczyk's behavior may have warranted a more serious response by DHS. Nevertheless, absent a discriminatory basis for Franczyk's conduct, the Court does not reach the questions surrounding DHS's handling of the situation.

[7] To the extent Duckett pursues a retaliation claim, it would also fail as a matter of law. A plaintiff establishes a *prima facie* case of retaliation under Title VII by showing "(1) she was engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006). Protected activity includes opposing discrimination that is, or that plaintiff has an objectively reasonable and good faith belief is, unlawful under Title VII. *Id.* at 341. Duckett's complaints do not reflect an objectively reasonable and good faith belief that she was complaining about sexual

Finally, the Court will deny Duckett's cross motion for summary judgment. As described in greater detail above, Duckett has failed to establish the absence of any genuine issues of material fact and that she is entitled to judgment as a matter law.

**CONCLUSION**

For the reasons set forth above, the Court will grant DHS's motion for summary judgment, deny Duckett's motion for summary judgment, and enter judgment in favor of DHS on all counts.

An appropriate Order follows.

BY THE COURT:

 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

---

discrimination. Instead, as discussed, they evidence her belief that Franczyk did not like her because of her involvement in his discipline.